# In the United States Court of Federal Claims

|  |  |
|---|---|
| AMES 1, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 22-cv-00196<br><br>Filed Under Seal: August 3, 2022<br><br>Publication: August 10, 2022[1] |

*Anne M. Tavella*, Davis Wright Tremaine LLP, Anchorage, Alaska for Plaintiff. With her on the briefs is *Jonathan A. DeMella*, Davis Wright Tremaine LLP, Seattle, Washington.

*David M. Kerr*, United States Department of Justice, Civil Division, Commercial Litigation, Washington, District of Columbia for Defendant.  With him on the briefs are *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division; *Patricia M. McCarthy*, Director, Commercial Litigation; *Deborah A. Bynum*, Assistant Director, Commercial Litigation; and *Nicholas T. Iliff, Jr.*, United States Air Force, Commercial Litigation Field Support Center.

## MEMORANDUM AND ORDER

Located on the edge of Anchorage, Alaska, "amid picturesque, majestic, snow-capped mountains, lakes, rivers and glaciers," Joint Base Elmendorf-Richardson (JBER) spans nearly 13,130 square acres, making it the largest military installation in Alaska.[2]  JBER is "one of the

---

[1] This Memorandum and Order was filed under seal in accordance with the Protective Order entered in this case (ECF No. 8) and was publicly reissued after incorporating all redactions proposed by the parties.  (ECF No. 28.)  The sealed and public versions of this Memorandum and Order are substantively identical, except for the addition of the publication date and this footnote.

[2]  https://installations.militaryonesource.mil/in-depth-overview/joint-base-elmendorf-richardson-jber (last viewed June 23, 2022); https://www.pacaf.af.mil/Info/Fact-Sheets/Display/Article/909896/elmendorf-air-force-base/ (last viewed June 23, 2022).

most prominent and active Air Force bases in the United States," housing elite units such as the United States Air Force's 3rd Wing, whose mission is to "support and defend U.S. interests in the Asia Pacific region and around the world."[3]   As a large military installation, JBER requires continued maintenance to keep its "more than 800 buildings, two runways and more than 150 miles of roads" in pristine condition.[4]  But Alaska is different than the lower forty-eight.  Situated above the 50th and 60th parallels, Alaska experiences "severe weather conditions" between October and March, narrowing the window for performing such maintenance.[5]

At issue in this protest are contract awards issued to third parties to perform maintenance and repair tasks at JBER.   The protestor, AMES 1, LLC (Ames 1), a "minority-owned, [Historically Underutilized Business Zone] small business," brings this post-award bid protest challenging the decision of Defendant United States, acting through the U.S. Department of the Air Force (Air Force), "not to award AMES 1 an indefinite-delivery/indefinite-quantity" (IDIQ) contract under solicitation number FA500021R0001 (Solicitation).   Complaint (ECF No. 1) (Compl.) ¶¶ 5-6, 10.  In its Complaint, Ames 1 argues that the Air Force arbitrarily and capriciously (i) considered Past Performance by looking beyond offerors' overall Past Performance rating, contradicting the Solicitation's express language and the recommendation of the Source Selection Evaluation Board (SSEB), and (ii) failed to properly consider Price, resulting in an unlawful award

---

[3]  https://installations.militaryonesource.mil/in-depth-overview/joint-base-elmendorf-richardson-jber (last viewed June 23, 2022); https://www.pacaf.af.mil/Info/Fact-Sheets/Display/Article/909896/elmendorf-air-force-base/ (last viewed June 23, 2022); https://www.jber.jb.mil/Units/Air-Force/ (last viewed June 23, 2022).

[4]   https://www.pacaf.af.mil/Info/Fact-Sheets/Display/Article/909896/elmendorf-air-force-base/ (last viewed June 23, 2022).

[5]  https://installations.militaryonesource.mil/in-depth-overview/joint-base-elmendorf-richardson-jber (last viewed June 23, 2022).

decision. *Id.* ¶¶ 40-53. Ames 1 seeks (1) an order finding unlawful the Air Force's failure to award Ames 1 a contract, (2) an injunction barring the Air Force from "proceeding with the award, including any task order award," (3) an order directing the Air Force to "conduct an evaluation and make an award consistent" with the Solicitation and law, (4) its attorneys' fees and costs associated with this action, including before the Government Accountability Office (GAO),[6] and (5) "such other relief as the Court deems appropriate." *Id.* at 17-18.

The parties subsequently filed motions for judgment on the administrative record. *See* Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 15) (Pl.'s MJAR); Defendant's Response to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record (ECF No. 16) (Def.'s Cross-MJAR); *see also*, Plaintiff's Reply in Support of Its Motion for Judgment on the Administrative Record (ECF No. 17) (Pl.'s Reply); *see infra* Background Section IV.

On March 31, 2022, this Court issued an injunction in a related case, *Frawner Corporation v. United States*, No. 22-cv-0078, mooting Ames 1's MJAR. *See* March 31, 2022 Order (ECF No. 21); *Frawner*, Memorandum and Order (ECF No. 36) (*Frawner* Mem. and Order). Accordingly, as reflected on the record and in this Court's March 31, 2022 Order (ECF No. 21), and for the reasons explained below, this Court **DENIES as moot** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 15) and **DENIES as moot** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 16).

---

[6] Plaintiff does not address fees or costs in its Motion for Judgment on the Administrative Record. *See* Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 15).

BACKGROUND[7]

The current protest centers on "a multiple-award IDIQ involving minor construction services as well as multi-discipline facility and real property repair and alteration services to be performed on Joint Base Elmendorf-Richardson" (JBER) in Anchorage, Alaska.  Compl. ¶ 6.  While the JBER contracting program involves two government contracts – a larger project referenced as the DB-MACC and a complementary Multiple Award Construction Contract (Mini-MACC) involving "small project[s]" – only the Mini-MACC contracts are at issue in this protest. Tab 2 (Advanced Procurement Plan (March 15, 2019)) at Administrative Record (AR) 78.  As explained further below, Ames 1 filed the present action after the Air Force declined to award it one of the Mini-MACCs.

I.    Solicitation

The Air Force issued the Solicitation for the Mini-MACC contracts on May 3, 2021.  *See, e.g.*, Tab 8 (Solicitation No. FA500021R0001 (May 3, 2021)); Tab 58 (Executed Contracts (December 28, 2021)) at AR 3291 (noting "DATE ISSUED 5/3/2021").  Bids were originally due by June 1, 2021, at 2:00 p.m. Alaska Daylight Time.  Tab 8 at AR 320.  Amendment 0005 to the Solicitation extended that deadline to June 14, 2021.[8]  Tab 13 (Amendment 0005 (June 6, 2020))

---

[7] This section contains the Court's findings of fact derived from the Administrative Record (AR). The AR is contained in ECF No. 13.  Documents within the Administrative Record are divided into "Tabs."  An index of the Administrative Record's tabs can be found at ECF No. 13-1.

[8] Between May 3, 2021 and June 7, 2021, the Air Force issued five other amendments to the Solicitation that did not substantively alter the evaluation process as it relates to this action.  *See* Tab 41 (Source Selection Evaluation Board Report (December 8, 2021)) at AR 2565 (Amendment 0001 – "Updated site visit date and building number for the seed project"; Amendment 0002 – "1st proposal due date extension, remove FAR clause, removed mission essential contractor services plan, and provide site visit sign in sheet"; Amendment 0003 – "Responded to contractor questions 1 through 40"; Amendment 0004 – "Responded to contractor questions 41-206, revised SOW, Spec and drawings for Seed Project"; and Amendment 0006 – "Changed Schedule B unit of issue from Lot to Project"); *see also* Tab 9 (Amendment 0001 (May 3, 2021)); Tab 10

4

at AR 835.  The Air Force anticipated awarding "up to 4" Mini-MACC contracts that would satisfy its construction needs at JBER on an "as needed basis."  Tab 8 at AR 320.  While the DB-MACC primarily fulfilled task orders "requiring more than incidental design or the services of a registered architect or professional engineer," the Mini-MACC complemented the DB-MACC by satisfying JBER's "small project" needs.  *Id*. at AR 324.  As specified in the Solicitation, the Mini-MACC's tasks, to be fulfilled by the Mini-MACC awardees, would consist of "multiple disciplines in general construction categories of on-base facilities for JBER."  *Id.*  Contractors fulfilling the Mini-MACC's requirements were expected to have the design and engineering expertise of a "general construction contractor."  *Id.*

The Mini-MACC awards are indefinite delivery/indefinite quantity (IDIQ) contracts governed under FAR "Part 15, Department of Defense (DoD) FAR Supplement Procedures, Guidance and Information Subpart 215.3, and Air Force FAR Supplement (AFFARS) Mandatory Procedure (MP) 5315.3."  Tab 8 at AR 323; *see* Tab 7 (Source Selection Plan (June 4, 2021)) at AR 317.  As defined by the General Services Administration (GSA), IDIQ contracts "provide for an indefinite quantity of services for a fixed time [and] are used when [an agency] can't determine, above a specified minimum, the precise quantities of supplies or services that the government will require during the contract period."  U.S. General Services Administration, "Indefinite Delivery, Indefinite Quantity Contracts," https://www.gsa.gov/buying-selling/new-to-gsa-acquisitions/how-to-sell-to-the-government/indefinite-delivery-indefinite-quantity-contracts (last viewed June 27, 2022).

---

(Amendment 0002 (May 25, 2021)); Tab 11 (Amendment 0003 (May 25, 2021)); Tab 12 (Amendment 0004 (May 27, 2021)); Tab 14 (Amendment 0006 (June 6, 2020))).

While Mini-MACC awardees would not know the Air Force's precise construction needs during the lifetime of the procurement, the Solicitation provided estimates for compensation. First, each Mini-MACC contract's value was estimated between $2,000 and $99,999,999 over the five-year base period given by the Solicitation. *See* Tab 8 at AR 320. Second, individual task orders under the IDIQ would have a minimum value of $2,000 and a maximum value of $2,000,000, "with the majority expected to be less than $500,000." *Id*. at AR 323, AR 395. Third, in addition to the IDIQ contracts, the Solicitation also included an award for a seed project, FXSB 17-1110, Repair BLDG. 5327 Exterior, JBER, AK, which had an estimated value of $500,000 to $1,000,000. Tab 8 at AR 320; *See* Tab 9 at AR 694 (describing the seed project). As explained below, the Air Force evaluated the seed project award concurrently with the IDIQ contract awards and used the seed project as a measure for evaluating Price for both awards. *See infra* Background Section I(B).

A.   Off-Ramp/On-Ramp Award Procedures

Although the Solicitation limited the number of initial Mini-MACC IDIQ contracts to "up to four," that pool of awardees could expand or contract if the Air Force triggered certain off-ramp/on-ramp procedures. Tab 8 at AR 336-37. In conjunction with selecting "up to four" IDIQ awardees, the Air Force created a "reserve vendor pool of up to ten (10) contractors" of otherwise eligible offerors who were not chosen for one of the awards. *Id*. at AR 336. The Solicitation stated that such reserve vendors "may be offered an opportunity, within the ordering period of this contract, to receive an IDIQ award and be authorized to participate in task order competition." *Id.* The Air Force could "off-ramp" one of the four awardees for reasons such as "[c]onvenience of the Government," and it could "on-ramp" contractors from the reserve pool if "in the Government's best interest." *Id.* In the event the agency chose to "on-ramp" bidders, it would

"start[] at the highest ranked On-Ramp contractor in the [reserve] pool." *Id.*  An "on-ramped" offeror would then "become an additional Mini-MACC awardee."  Tab 8 at AR 337.  The Air Force was not required to "off-ramp" one of the four original awardees prior to "on-ramping" an offeror from the reserve vendor pool.  *See id.* at AR 336-37.

        B.  <u>Basis of Evaluation</u>

This procurement was a "best value" procurement conducted on a "competitive subjective tradeoff" of (1) Price and (2) Past Performance, with the latter "significantly more important" than the former.  *Id.* at AR 389.  The Air Force only considered "offerors whose proposals conform[ed] to all required terms and conditions, include[ed] all required representations and certifications, [met] all requirements set forth in the RFP[,] and also provide[d] the best value to the Government."  *Id.*

The Solicitation permitted the Air Force to award a contract to another offeror that did not submit the lowest price "if the difference in the Past Performance Confidence Rating of another offeror with [a] higher price justifie[d] the higher price premium."  *Id.* at AR 391.  However, such justification had to be based on "an integrated assessment best value award decision using the [total evaluated price (TEP)] and the Past Performance Confidence Rating."  *Id.*  At the final stage of its analysis, "[o]nce selected awardees [had] been identified for the IDIQ, the Government . . . rank[ed] each selected awardee by price from lowest to highest for the seed project (Attachment J-4) and award[ed] the seed project to the lowest offeror."  *Id.*  Accordingly, consideration of the IDIQ and seed project awards occurred concurrently.  *Id.*  The agency's evaluation of Price and Past Performance are described below.

i.  <u>Factor 1: Price</u>

Price was evaluated based on offerors' proposed pricing for the seed project.  Tab 8 at AR 389.  Offerors submitted their Attachment J-4 Price Schedule, which was then used as the offeror's total evaluated price (TEP) for its bid.  *Id.*  While the Solicitation required the Air Force to "evaluate the fairness and reasonableness of the Total Evaluated Price (TEP) for all offerors," the Air Force retained the discretion to choose its "price analysis technique[] and procedure[]."  *Id.* The Solicitation lists "examples" of such techniques:

(a) Price analysis: The process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit.
(b) Comparison of proposed prices received in response to the [S]olicitation. Normally, adequate price competition establishes price reasonableness.
(c) Comparison of previously proposed prices and previous Government contract prices with current proposed prices for the same or similar effort.

*Id.*  In addition to a price reasonableness analysis, the agency could — but was not required to — conduct a price realism analysis to ensure that "the project [could] realistically be completed within the proposed constraints."  *Id.*  As a result of any price realism analysis, the Air Force would disregard price proposals that it found "unrealistically low."  *Id.*

ii.  <u>Factor 2: Past Performance</u>

Past Performance was evaluated to "assess the degree of confidence the Government has in the offeror's ability to meet the [S]olicitation requirements based on the offeror's demonstrated record of performance."  Tab 8 at AR 390.  The Air Force could evaluate up to five past projects submitted by an offeror.  *Id*. at AR 379.  In assessing Past Performance, the Air Force could "give greater consideration to information on those contracts deemed most relevant to the effort described in [the] [S]olicitation."  *Id*. at AR 391.

The Solicitation indicated that "[r]elevant past performance information for the five (5) completed projects must demonstrate minimum design/build and build experience with multiple

disciplines." *Id*. at AR 380.  While "[n]ot all projects are required to have design/build or multiple-discipline aspects," the Solicitation noted that "this experience must be represented within the total of submitted contracts/projects." *Id*. at AR 380-81.  The Solicitation listed applicable disciplinary skills as follows:

> (1) Demolition
> (2) Painting
> (3) Carpentry
> (4) Mechanical/HVAC/Plumbing
> (5) Fire Sprinkler/Fire Alarm Systems
> (6) Electrical
> (7) Structural
> (8) Minimal Design as specified in Mini-MACC SOW 01000, para. 1.3
> (9) Hazmat/Asbestos/Abatement
> (10) Roofing/Insulation/Thermal & Moisture Control
> (11) Civil work

*Id*. at AR 380.

## 1.  Past Performance Documentation

Offerors were required to submit the following documentation along with each past project: a (1) Past Performance Questionnaire, (2) Past Performance Questionnaire Cover Letter, (3) Past Performance Supplement Worksheet, and (4) Past Performance Information Document.  Tab 8 at AR 379.

*Past Performance Questionnaires (PPQs) and Cover Letter*.  PPQs, also referenced as Attachment J-7 to the Solicitation, are completed by references who worked with the offeror on one of its past projects.  *Id*. at AR 379.  The Solicitation "require[d] the offeror send out a PPQ to each [reference] identified in the Past Performance" section.  *Id*.  The PPQ contained fifteen multiple choice questions, and the reference was asked to "answer all questions by checking only one (1) response per question, [while placing] additional information . . . in the space provided."  Tab 8 at AR 613-18.  In addition to the fifteen multiple choice questions, the PPQ also requested

the reference indicate, *inter alia*, the project's (i) "original" and "final" award amount, (ii) status as "active" or "100% complete," (iii) "completion date" or "expected completion date," and (iv) inclusion of any of the eleven disciplines (*i.e.*, Demolition) listed in the Solicitation.  *Id*. at AR 614; *see supra* p. 9.  After completing the PPQ, the reference was required to email the PPQ and PPQ Cover Letter directly to Air Force personnel Donald Dougherty and John Jeffrey indicating whether the reference would recommend the offeror for the procurement.  *See* Tab 8 at AR 379.

    *Past Performance Supplement Worksheet*.  The Past Performance Supplement Worksheet, also referenced as Attachment J-8 to the Solicitation, is a Microsoft Excel spreadsheet completed by the offeror.  An offeror must list its submitted projects (five maximum) indicating each past project's (i) "[p]eriod of [p]erformance," (ii) "[p]rice," and (iii) inclusion of any of the eleven disciplines (*i.e.*, Demolition) listed in the Solicitation.  *Id*. at AR 619; *see supra* p. 9.

    *Past Performance Information Document*.  Offerors were required to provide a "[s]ummary of each contract/project" that included the following:

> (a) Company/Division name[,] (b) Contract/Project Title[,] (c) Contract/Project Location[,] (d) Contracting Agency/Customer[,] (e) Contract Number[,] (f) Contract Dollar Value[,] (g) Period of Performance[,] (h) Verified, up-to-date name, mailing and e-mail addresses, and telephone number of the contracting officer (Point-of-Contact)[,] (i) Comments regarding compliance with contract terms and conditions (e.g. scope, cost and period of performance, labor and statutory requirements)[,] (j) Descri[ption] [of] any known performance deemed unacceptable by the customer, or not in accordance with the contract terms and conditions [and] description of how it was resolved[,] (k) [S]ummary description of the project scope of work [including] (i) rationale supporting your assertion of relevance and identify aspects (scope, magnitude of effort, and complexity) of the contracts deemed relevant and how they relate to the proposed effort [and] (ii) [d]emonstration of performance of minimal design/build[,] [d]emonstration of management of multiple discipline construction projects[,] [d]emonstration of meeting project cost, quality standards and schedule, (l) Discussion of noteworthy aspects and challenges[,] [and] (m) Pictures of projects may be included, if desired.

*Id*. at AR 379-80.

2.   <u>Past Performance Analysis</u>

Based on the documentation provided by the offerors and their references, each of the five submitted projects were assessed for "Recency and Relevancy."  *Id*. at AR 390.  Those projects deemed "Recent" and "Relevant" were then assessed for Quality.  *Id.*  The Solicitation defined Recent projects as "those efforts completed for any customer(s) within the last three (3) years prior to the issuance date of the [S]olicitation."  *Id.*  The Solicitation noted that Relevant projects would be "assessed based upon the extent to which past performance is of similar scope, magnitude and complexity to the type of projects exemplified by the seed project for this [S]olicitation."  *Id.*  The Solicitation further noted that "[t]o be considered relevant, greater consideration [would] be given to submitted contracts demonstrating work completed above the 60th parallel in a seismically active area (e.g. Alaska)."  Tab 8 at AR 380.  Further, "[c]omplexity and scope [could] be determined by viewing the previous contracts" based on the presence of the eleven disciplines listed in the Solicitation.  *Id*. at AR 381.  The Solicitation provided the following Relevancy adjectival ratings and accompanying definitions:

> Rating: Very Relevant. Definition: Present/past performance involved essentially the same scope and magnitude of effort and complexities this solicitation requires.

> Rating: Relevant. Definition: Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires.

> Rating: Somewhat Relevant. Definition: Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires.

> Rating: Not Relevant. Definition: Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires.

*Id*. at AR 390.  The Solicitation warned that only those past projects deemed "[R]ecent, [R]elevant and [S]omewhat [R]elevant" would be assessed for Quality.  *Id.*  Accordingly, a "Not Recent" or

"Not Relevant" project would not receive further consideration for purposes of Past Performance analysis. *Id.*

Quality was assessed "with a focus on quality control, timely performance, effectiveness of management, and regulatory compliance." *Id.* After the Air Force completed its (i) Recency, (ii) Relevancy, and, if applicable, (iii) Quality assessment for up to five of an offeror's submitted projects, each offeror was then "assigned a single past performance confidence rating." Tab 8 at AR 391. The Past Performance confidence ratings and their accompanying definitions were as follows:

> Rating: SUBSTANTIAL CONFIDENCE. Description: Based on the offeror's recent/relevant performance record, the government has a high expectation that the offeror will successfully perform the required effort.

> Rating: SATISFACTORY CONFIDENCE. Description: Based on the offeror's recent/relevant performance record, the government has a reasonable expectation that the offeror will successfully perform the required effort.

> Rating: NEUTRAL CONFIDENCE. Description: No recent/relevant performance is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance.

> Rating: LIMITED CONFIDENCE. Description: Based on the offeror's recent/relevant performance record, the government has a low expectation that the offeror will successfully perform the required effort.

> Rating: NO CONFIDENCE. Description: Based on the offeror's recent/relevant performance record, the government has no expectation that the offeror will successfully perform the required effort.

*Id.*

## II.   The Air Force's Analysis and Award Decisions

The Air Force received thirteen timely proposals from the following entities: Ahtna Global, LLC (Ahtna); AMES 1, LLC (Ames 1); Ancor, Inc. (Ancor); Eklutna Construction & Maintenance, LLC (Eklutna); Frawner Corporation (Frawner); HPM, Inc. (HPM); Iyabak

Construction, LLC (Iyabak); Nodak Electric & Construction, Inc. (Nodak); Orion Construction, Inc. (Orion); SD Construction, LLC (SD Construction); Tikigaq Federal Services, LLC (Tikigaq); Tyonek Construction Services, LLC (Tyonek); and White Mountain Construction, LLC (White Mountain Construction).[9]  *See* Tab 41 (Source Selection Evaluation Board Report (December 8, 2021)) at AR 2566.  The Air Force's review proceeded in two steps.  First, its Source Selection Evaluation Board (SSEB) issued a report recommending awardees based on analyses performed by its "pricing and past performance evaluation teams."  *Id.* at AR 2565-66.  Second, its Source Selection Authority (SSA) reviewed the SSEB's report and made the ultimate award decisions. *See* Tab 44 (Source Selection Decision (December 20, 2021)) at AR 2704-11.  Each entity's analysis and report is summarized in turn.

A.  <u>The Source Selection Evaluation Board (SSEB) Report</u>

On December 8, 2021, the SSEB issued a report analyzing the offerors and detailing its awardee recommendations to the SSA.  Tab 41 at AR 2652.

i.  <u>Factor 1: Price</u>

In evaluating Price, the Air Force's price evaluation team "reviewed each offeror's Attachment [J-]4 Price Schedule for the seed project to calculate each offeror's [Total Evaluated Price (TEP)]."  Tab 41 at AR 2566.  Based on its review, the price evaluation team determined that it was unnecessary to conduct a price realism analysis for this procurement.  *Id.*  Next, in assessing price reasonableness, the SSEB employed "the technique outlined in FAR 15.404-1(b)(2)(i)," by comparing proposed prices received "to establish a fair and reasonable price."  *Id.* The SSEB went a step further to "assist in a more thorough analysis of price" by calculating the

---

[9] Defendant did not evaluate two additional offerors — ███████████████████████████ ███████████████████.  Tab 41 at AR 2566-67.  ██████ submitted its proposal late, and the Air Force never received ██████ proposal.  *Id.*

average of all TEPs and comparing each price "to the mean of all evaluated proposals." *Id.*   In its documentation of each offeror's Price assessment, the SSEB indicated each offeror's (i) total evaluated price, (ii) "[m]ean [p]riced [p]roposal," (iii) "[d]ifference from [m]ean [p]riced proposal" in dollars, and (iv) "[d]ifference from [m]ean [p]riced [p]roposal" by percentage. *See, e.g.*, Tab 41 at AR 2613.

The SSEB determined that price competition in this procurement — among thirteen bidders — was a factor that ensured reasonable prices for the Air Force:

> In this case, it is apparent that two or more responsible offerors, competing independently, submitted priced offers that satisfy the Government's expressed requirement.  Therefore, price competition can be used as the basis to establish a fair and reasonable price.

*Id.* at AR 2568.  However, the Air Force's analysis did not end there.  It noted an expectation of price variation in the proposals because "in the Anchorage market individual project costs vary, sometimes quite significantly, between offerors on competitive proposals."  *Id.*   The SSEB provided numerous reasons for the pricing disparity in Anchorage including: "some contractors have their own workforce for certain disciplines, some own equipment for certain project types vs. having to lease equipment, better relationships with limited sub-contractor marketplace, etc."  *Id.* Finally, in reference to the two highest priced bids (Tyonek and Eklutna), the SSEB noted that "although th[ese] offeror[s'] price[s] [are] substantially higher than other offerors that does not mean [their] offer[s] [are] not fair and reasonable.  [Instead,] their price is still considered [to] be within a reasonable range given the extreme variability in prices seen in the past year."  Tab 41 at AR 2582 (Eklutna), AR 2602 (Tyonek).

## ii.   Factor 2: Past Performance

The past performance evaluation team assessed Past Performance by analyzing the required documentation provided by offerors and their references as well as "information obtained [in

accordance with] FAR Part 42.1503(g), and . . . any other information independently obtained by the Government."  *Id*. at AR 2566; *see supra* Background Section I(B)(ii)(1).   While the Solicitation did not specify how "scope, magnitude of effort, and complexity" would be evaluated, the SSEB evaluated (i) "scope," (ii) "magnitude," and (iii) "complexity" separately as independent sub-factors of Relevance, with each prong receiving its own adjectival sub-rating reflecting one of the overall Relevance adjectival ratings.  *See* Tab 41.  The SSEB then automatically applied the lowest of the three adjectival sub-ratings as the overall Relevance rating for that project.  *Id.*  For example, Ames 1's F-35A Aircraft Maintenance Unit Administrative Facility (EIE432) project, which received "Very Relevant" "scope" and "complexity" sub-ratings, but a "Not Relevant" "magnitude" sub-rating, was rated "Not Relevant."  Tab 41 at AR 2580.  The SSEB evaluated each Relevance sub-factor as follows:

*Scope.*  The SSEB assessed "scope" by determining a past project's inclusion of the eleven disciplines stated in the Solicitation.[10]  *See, e.g.*, Tab 41 at AR 2569; *see also supra* p. 9.  Past projects demonstrating three or more of the eleven disciplines received a "Very Relevant" "scope" sub-rating.  *See generally* Tab 41 (assigning a "Very Relevant" "scope" sub-rating for past projects with three through eleven of eleven disciplines listed in the Solicitation).  Past projects containing fewer than three disciplines received lower "scope" sub-ratings.  *See, e.g.*, *id*. at AR 2593 (assigning ██████████████████████████ project a "Relevant" "scope" sub-rating where it demonstrated two of the eleven disciplines listed in the Solicitation).

*Magnitude.*  In evaluating "magnitude," the SSEB assessed whether a past project was "representative of the task order values projected for the Mini-MACC."  *See, e.g.*, *id*. at AR 2569.

---

[10] While the Solicitation did not specify how its "multiple discipline[ary]" requirement could be met, the SSEB analyzed those "disciplines" in its "scope" sub-factor analysis.  *See* Tab 8 at AR 380-81.

In doing so, it assigned "Very Relevant" sub-ratings to past projects valued less than $2 million and "Not Relevant" sub-ratings to past projects valued more than $2 million. *Compare id*. at AR 2579 (████████████████████████████████████████████████████ ████████████████████████████████████████), *with id*. at AR 2580 (███████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████).

 *Complexity*. A past project's "complexity" sub-rating hinged on whether it was performed "above the 60th parallel in a seismically active area." *See, e.g.*, *id*. at AR 2644. The SSEB assigned "Very Relevant" "complexity" sub-ratings to projects performed above the 60th parallel and in a seismically active area. *Id*. (████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████). If a past project was performed below the 60th parallel or was not in a seismically active area, it received a lower "complexity" sub-rating. *See, e.g.*, *id*. at AR 2622 (assigning "Relevant" "complexity" sub-rating to ███████████████████████ █████████ project "performed in Glacier Bay, AK, which is below the 60th parallel and in a seismically active area").

 In assessing Recency, the SSEB mistakenly noted that projects "completed within three (3) years of the solicitation date of April 30, 2021" were Recent. *See, e.g.*, *id*. at AR 2568. Defendant's counsel noted at oral argument in *Frawner* that Defendant believes this was a typographical error in the SSEB's report as the Solicitation was issued on May 3, 2021, not on April 30, 2021. *Frawner*, Transcript of Oral Argument, dated March 17, 2022 (ECF No. 30) at 55:9-14; *see also* AR 3291 (noting "DATE ISSUED 5/3/2021").

Next, for past projects deemed Relevant and Recent, the SSEB assigned a "general [Q]uality rating for each PPQ . . . based on the answers to the questions in the PPQ and narratives, if provided." Tab 41 at 2566; *see also* Tab 41 at AR 2580 (█████████████████████████████████████████████████████████████████████████████████). The SSEB's Quality ratings included: "Exceptional," "Very Good," "Not Received," and "Not Rated." *See generally* Tab 41. Neither the Solicitation nor the SSEB's report provide separate definitions for these ratings. *Id.*; *see also* Tab 8.

Finally, consistent with the definitions provided in the Solicitation, each offeror received an overall Past Performance rating based on the SSEB's confidence in the offeror's ability "to perform the work under this Mini-MACC program." *See, e.g.*, Tab 41 at AR 2647; *see also* Tab 8 at AR 391 (Past Performance confidence rating definitions). The SSEB assigned "Substantial Confidence" ratings to those offerors "found to have performed work comparable to the scope, magnitude, and complexity associated with Mini-MACC task orders, and based upon evaluation of PPQs and CPARs [that] obtained Very Good to Exceptional [Quality] ratings." Tab 41 at AR 2649.

### iii.   Tradeoff Analysis and Recommendation

After concluding its Price and Past Performance review, the SSEB ranked offerors based on the "past performance confidence rating of the Offerors['] ability to perform the work anticipated under the Mini-MACC contract and by the TEP from lowest to highest within each confidence rating." *Id.* at AR 2648. The SSEB's rankings, based on Price and Past Performance, are reflected in the following chart:[11]

---

[11] The SSEB did not provide a reason for shading cells within its chart differently. Tab 41 at AR 2648.

| | Offeror | Factor 1: TEP | Factor 2: Past Performance |
|---|---|---|---|
| 1 | SD Construction, LLC | $933,000.00 | Substantial Confidence |
| 2 | Ancor, Inc. | | Substantial Confidence |
| 3 | AMES 1, LLC | | Substantial Confidence |
| 4 | Nodak Electric & Construction, Inc. | | Substantial Confidence |
| 5 | Orion Construction, Inc. | $1,441,274.11 | Substantial Confidence |
| 6 | Tyonek Construction Services, LLC | $1,874,000.00 | Substantial Confidence |
| 7 | Eklutna Construction & Maintenance, LLC | $1,995,080.00 | Substantial Confidence |
| 8 | Ahtna Global, LLC | | Satisfactory Confidence |
| 9 | Frawner Corporation | | Satisfactory Confidence |
| 10 | Iyabak Construction, LLC | | Satisfactory Confidence |
| 11 | White Mountain Construction, LLC | | Satisfactory Confidence |
| 12 | HPM, Inc. | | Neutral Confidence |
| 13 | Tikigaq Federal Services, LLC | | Neutral Confidence |
| 14 | | | Late – Not evaluated |
| 15 | | | No Proposal Received |

*Id.*

The SSEB ranked offerors receiving "Substantial Confidence" Past Performance ratings above offerors with "Satisfactory Confidence" and "Neutral Confidence" Past Performance ratings, without regard to Price. *Id.* Offerors within each Past Performance confidence rating category were then ranked from lowest to highest Price. *Id.* The SSEB determined that offerors receiving "Substantial Confidence" Past Performance ratings "were all essentially of equal value to the [G]overnment" and that "there were no single or cumulative past performance records that demonstrated that an offeror's performance history warranted an assessment of additional value amongst the other offers evaluated as '[S]ubstantial [C]onfidence.'" Tab 41 at AR 2649. Accordingly, the SSEB determined that for offerors receiving a "Substantial Confidence" Past Performance rating, it need not trade off Price "for a higher performance confidence rating since the lowest priced offers with [a] [S]ubstantial [C]onfidence [rating] are recommended for award." *Id.*

Rather, the SSEB conducted tradeoff analyses only for offerors receiving "Satisfactory Confidence" or "Neutral Confidence" Past Performance ratings. *See* Tab 41 at AR 2649-51. Its tradeoff analysis among those offerors was nearly identical — a lower priced bid did not outweigh

a higher rated Past Performance ranking.  *Id.*  For example, the SSEB determined that because Frawner received a "███████████████" Past Performance rating and the Solicitation stated that "Past Performance was significantly more important than [P]rice," Frawner should not receive one of the four Mini-MACC awards as its lower Price did not outweigh its ███████ Past Performance rating.  Tab 41 at AR 2649-50.  Rather, the SSEB recommended that Frawner "be in the on-ramp pool."  *Id*. at AR 2649.  In sum, a bidder could not rise in ranking if it had a lower Price, but a weaker "Substantial Confidence" Past Performance rating than another offeror.

As Ames 1 bid the third lowest price among offerors receiving a "████████████████████" rating, the SSEB recommended Ames 1 receive a Mini-MACC award.  *Id*. at AR 2652.  In addition to Ames 1, the SSEB also recommended the following offerors receive a Mini-MACC award: SD Construction, Ancor, and Nodak.  *Id*.  It further recommended the following offerors as on-ramp contractors: (1) Orion, (2) Tyonek, (3) Eklutna, (4) Ahtna, (5) Frawner, (6) Iyabak, (7) White Mountain, (8) HPM, and (9) Tikigaq.  *Id.*

B.  <u>The Source Selection Authority (SSA) Report and Decision</u>

In the second phase of the Air Force's evaluation, the Source Selection Authority (SSA), reviewed the SSEB's report along with "all available documents pertaining to the acquisition, including evaluation briefing slides, offeror proposals, consensus documentation, evaluation reports, price information, and other documentation."  Tab 44 at AR 2704.  The SSA then made its award decisions on December 20, 2021, "after extensive review of the documentation and in consultation with the Source Selection Evaluation Board (SSEB), and . . . advisors."  *Id.* at AR 2704, 2711.  While it adopted many of the SSEB's findings, the SSA's conclusions differed from the SSEB report in significant respects.

19

i.   Factor 1: Price

In analyzing price reasonableness, the SSA adopted the SSEB's conclusion of reasonable prices given project costs in the Anchorage market "vary, sometimes quite significantly, between offerors on competitive proposals."  Tab 41 at AR 2568.  The SSA further determined that this price variance, influenced by supply and labor factors, was exacerbated by the "recent COVID-affected environment."  *Id.*  The SSA also based its price reasonableness determination on competition among awardees because "future [task orders] will be competed amongst all the offerors and therefore no awardee with consistently high prices will ever receive any of those competed [task orders]."  *Id.*

ii.   Factor 2: Past Performance

In analyzing Past Performance, the SSA accepted the SSEB's Past Performance adjectival ratings and sub-ratings, but differed with the SSEB's conclusion that offerors with the same overall Past Performance rating necessarily provide the Air Force with the "essentially . . .  equal value." Tab 44 at AR 2710 ("I have reviewed the SSEB Report and agree with the rationales documented for the Confidence Ratings."); Tab 41 at AR 2649.  Instead, the SSA determined that "there are past performance records that demonstrate that some offeror[s'] performance history warrants an assessment of additional value amongst the other offers evaluated as '[S]ubstantial [C]onfidence.'" Tab 44 at AR 2706.

iii.   Tradeoff Analysis and Award Decision

The SSA came to a different award determination than recommended by the SSEB. Specifically, three bidders recommended by the SSEB for Mini-MACC awards did not receive an award following the SSA's review.  *Compare* Tab 41 at AR 2651-52 (SSEB's recommendation), *with* Tab 44 at AR 2708-10 (SSA's decision).  For example, the SSEB ranked Ames 1 third and

recommended it for an award, yet the SSA moved it to seventh place on the on-ramp.  *Compare* Tab 41 at AR 2651-52, *with* Tab 44 at AR 2708-10.  On December 20, 2021, the SSA awarded the IDIQ contracts to (1) SD Construction, (2) Tyonek, (3) Eklutna, and (4) Orion, the "four Offerors with the highest number of Very Relevant efforts in correlation with the highest number of Exceptional [PPQs] and CPARS."  *Id*. at AR 2707.  All four awardees received "Substantial Confidence" ratings.  *Id.*  As the top placed offeror, SD Construction was also awarded the seed project.  *Id.*

The SSA stated that the "remaining nine (9) offerors that submitted timely proposal[s]" would be on-ramp contractors in the following order: (1) Nodak, (2) Ancor, (3) Ames 1, (4) Frawner, (5) Ahtna, (6) White Mountain, (7) Iyabak, (8) HPM, and (9) Tikigaq.  Tab 44 at AR 2708-09.  The SSA listed the on-ramp awardees "in order of Confidence Rating[,] [and within a Confidence Rating category based on] the number of projects found to be Exceptional and those determined to be Very Good."  *Id*. at AR 2709.

The SSA concurred with the SSEB's Price analysis using offerors' total evaluated price (TEP) for the seed project.  *Id*. at AR 2706.  However, the SSA noted that while TEPs are "useful as a guide to give the Government an indication of how each offeror would price this specific project, . . . it is not a reliable indicator of their prices for future requirements and is certainly not an indication of their prices relative to other offerors for that future work."  *Id*. at AR 2707.  Accordingly, the SSA concluded that instead of relying only on Price in comparing offerors with the same Past Performance rating, the Air Force had to consider "evidence of quality in recent and relevant projects" (*i.e.,* Quality ratings).  *Id.*

Having determined that offerors with the same Past Performance rating are not necessarily of the same value to the Government, the SSA disagreed with the SSEB's decision to forgo a best

value tradeoff analysis for offerors receiving a "Substantial Confidence" rating.  *Id*. at AR 2706.

Accordingly, the SSA performed a best value analysis for the four awardees.  *Id*. at AR 2706-08.

Each is described in turn.

*SD Construction*.  SD Construction's Price was $933,000.00 with a "Substantial

Confidence" Past Performance rating.  *Id.* at AR 2708.  The SSA determined that SD Construction

"ha[d] the offer that is most beneficial to the Government and is [thus] the first awardee listed."

*Id*. at AR 2707.  Not only did SD Construction offer the lowest price at "33.6% below the mean

of all TEPs," but it also had the "highest [Q]uality rating[s] of any offeror (tied with Tyonek)."  *Id.*

*Tyonek & Eklutna*.  Tyonek's Price was $1,874,000.00, while Eklutna's Price was

$1,995,080.00.  *Id.* at AR 2708.  Both bidders received "Substantial Confidence" Past Performance

ratings.  *Id.*  The SSA noted that Tyonek's TEP was "33.9% above the mean of all TEPs and

100.9% higher than SD [Construction]."  *Id.* at 2707.  Eklutna had "the highest TEP of any offeror

and [was] 42.0% above the mean."  *Id.*  Accordingly, the SSA reasoned that Tyonek and Eklutna

warranted the second and third awards, respectively, for the following reasons:

> First, they have higher quality ratings than the offerors identified below as going
> into the on-ramp pool.  Second, any future [task orders] awarded under this Mini-
> MACC IDIQ will be competed amongst all awardees which will prevent any
> excessively high prices from being paid by the Government.  Third, although these
> two companies have the highest TEPs of all considered offerors their TEPs are not
> outside the range of reason given the high variability in construction pricing and
> methods in this region.  Finally, the need for well-qualified contractors able to
> provide quality work for the period of this Mini-MACC is worth more to the
> Government than the risk represented by higher TEPs for the seed project,
> especially when that seed project will be awarded to a different offeror.

Tab 44 at AR 2707-08.

*Orion*.  For the fourth award, the SSA recognized that two offerors it considered — Orion

and Nodak — "are very closely matched" as (i) each received three "Exceptional" Quality ratings

and one "Very Good" Quality rating, ██████████████████████████

22

███████████████████████████████████████████████ *Id.* at AR 2708.

Orion's Price was $1,441,274.11, while Nodak's Price was ███████████. *Id.* at AR 2708-09.

Both bidders received "Substantial Confidence" Past Performance ratings. *Id.* ████████████

██████████████████████, the SSA awarded the fourth contract to Orion because all four of its

rated projects received "Very Relevant" sub-ratings, whereas Nodak had three projects receiving

"Very Relevant" sub-ratings and one project receiving a "Relevant" sub-rating. *Id.* The SSA

further rationalized this tradeoff by referencing the Solicitation's preference for Past Performance

over Price. *Id.* ("Since we stated that Past Performance is significantly more important than price

I conclude that Orion offers the best value to the Government, ████████████████████,

based on the slightly higher quality demonstrated by the projects submitted for Past Performance

when relevancy is also considered.").

The following chart summarizes the SSEB's and SSA's overall findings:

| Bidder Name | SSEB Ranking Recommendation | SSA Ultimate Ranking | Factor #1: Price[12] | Factor #2: Past Performance[13] |
|---|---|---|---|---|
| SD Construction | 1 (Recommended awardee) | 1 (Awardee and seed project awardee) | $933,000.00 | <u>Substantial Confidence</u><br>Exceptional (4)<br>Very Good (1) |
| Tyonek | 6 | 2 (Awardee) | $1,874,000.00 | <u>Substantial Confidence</u><br>Exceptional (4)<br>Very Good (1) |

[12] The prices referenced reflect each bidder's total evaluated price.

[13] Bidders' overall Past Performance ratings are underlined in the chart with individual Quality ratings listed below. A project received a "Not Assessed" rating if it was not assigned a Quality rating, a "Not Considered" rating if it failed to meet the Solicitation's technical requirements, and a "Not Received" rating if a bidder failed to submit all requisite information for a past project. Tab 41 at AR 2566 ("Not Assessed"); Tab 41 at AR 2594, 2612, 2629, 2634 ("Not Considered"); Tab 41 at 2581, 2640 ("Not Received").

| Eklutna | 7 | 3 (Awardee) | $1,995,080.00 | <u>Substantial Confidence</u><br>Exceptional (3)<br>Very Good (2) |
|---|---|---|---|---|
| Orion | 5 | 4 (Awardee) | $1,441,274.11 | <u>Substantial Confidence</u><br>Exceptional (3)<br>Very Good (1)<br>Not Assessed (1) |
| Nodak | 4 (Recommended awardee) | 5 (On-Ramp) | ███████ | <u>Substantial Confidence</u><br>Exceptional (3)<br>Very Good (1)<br>Not Considered (1) |
| Ancor | 2 (Recommended awardee) | 6 (On-Ramp) | ███████ | <u>Substantial Confidence</u><br>Exceptional (2)<br>Very Good (2) |
| Ames 1 | 3 (Recommended awardee) | 7 (On-Ramp) | ███████ | <u>Substantial Confidence</u><br>Exceptional (1)<br>Very Good (2)<br>Not Received (1)<br>Not Assessed (1) |
| Frawner | 9 | 8 (On-Ramp) | ███████ | <u>Satisfactory Confidence</u><br>Exceptional (1)<br>Very Good (2)<br>Not Assessed (2) |
| Ahtna Global | 8 | 9 (On-Ramp) | ███████ | <u>Satisfactory Confidence</u><br>Exceptional (1)<br>Very Good (4) |
| White Mountain Construction | 11 | 10 (On-Ramp) | ███████ | <u>Satisfactory Confidence</u><br>Exceptional (1)<br>Not Assessed (3)<br>Not Considered (1) |
| Iyabak | 10 | 11 (On-Ramp) | ███████ | <u>Satisfactory Confidence</u><br>Very Good (2)<br>Not Assessed (2)<br>Not Received (1) |
| HPM Inc. | 12 | 12 (On-Ramp) | ███████ | <u>Neutral Confidence</u><br>Not Considered (3) |

| Tikigaq Federal Services | 13 | 13 (On-Ramp) | ███████ | Neutral Confidence Very Good (1) Not Assessed (1) Not Considered (3) |
|---|---|---|---|---|

*See* Tab 41; Tab 44.

III.   Ames 1 Debriefing

Despite that the SSEB recommended Ames 1 as an awardee, the SSA — and ultimately the Air Force — ranked Ames 1 as the seventh best bid, and on December 17, 2021, notified Ames 1 that it was not selected for a Mini-MACC award.  Tab 44 at AR 2708-10; Tab 43 (Pre-Award Notice to Unsuccessful Offeror (December 17, 2021)) at AR 2688-89.  The Air Force issued a formal Post-Award Notification to Ames 1 on December 28, 2021.  Tab 49 (Post-Award Notice of Unsuccessful Offeror (December 28, 2021)) at AR 2892-95.  While the Air Force informed Ames 1 that it was not selected for a Mini-MACC award, the Air Force also noted that Ames 1 would be placed in the on-ramp reserve vendor pool.  *Id.* at AR 2893.  Consistent with the Air Force's debriefing protocols, Ames 1 submitted questions to the Air Force on January 3, 2022, and the Air Force timely responded on January 5, 2022.  Tab 60 (Post-Debriefing Questions / Response – AMES 1 (January 5, 2022)) at AR 4344-46.

IV.   Procedural History

On January 7, 2022, Ames 1 timely filed a bid protest at the GAO.  Tab 66 (Protest of AMES 1, LLC (January 7, 2022)) at AR 4411-12.  The GAO dismissed Ames 1's protest on February 4, 2022, due to a pending protest at the United States Court of Federal Claims concerning the same Solicitation by another disappointed bidder, Frawner Corporation.  Compl. ¶¶ 3-4; *see also Frawner Corporation v. United States*, No. 22-cv-0078.

On February 22, 2022, Ames 1 filed the present protest.  *See* Compl.  On March 11, 2022, Ames 1 filed its Motion for Judgment on the Administrative Record, and on March 22, 2022,

Defendant filed its Cross-Motion for Judgement on the Administrative Record.  *See* Pl.'s MJAR; Def.'s Cross-MJAR.  In the related case, *Frawner Corporation v. United States*, No. 22-cv-0078, Defendant consented to a voluntary stay of its award through March 31, 2022, also reflected in a Joint Status Report filed by the parties to this action.  *See* March 1, 2022, Joint Status Report (ECF No. 11) (JSR) at 1.  On March 30, 2022, this Court conducted oral argument on the pending motions at the United States District Court for the District of Alaska in Anchorage, Alaska.  *See* Transcript of Oral Argument, dated March 30, 2022 (ECF No. 20) (Tr. Oral Arg.).

Due to the "fast approaching start to the Alaskan construction season and the expiry of [D]efendant's voluntary stay," on March 31, 2022, the Court issued a decision on the record in the current action and in *Frawner*.  Transcript of Joint Status Conference dated March 31, 2022 (ECF No. 23) (*Ames* Mar. 31 Tr.) at 3:8-10; JSR at 2; *Frawner*, Transcript of Joint Status Conference dated March 31, 2022 (ECF No. 35) (*Frawner* Mar. 31 Tr.).  In *Frawner*, the Court enjoined the Air Force from awarding or proceeding with any award under the Solicitation, other than to SD Construction, and ordered the Air Force to undertake corrective action should it opt to continue with Mini-MACC awards under the Solicitation.[14] *Frawner* Mar. 31 Tr. at 3:24-4:12, 13:17-15:18; *Frawner* Mem. and Order; *Frawner*, Order Granting in Part Plaintiff's MJAR and Denying in Part Defendant's Cross-MJAR (ECF No. 33) (*Frawner* Order).  This Court's injunction in *Frawner* mooted Ames 1's MJAR.  *Ames* Mar. 31 Tr. at 4:9-14.  On March 31, 2022, on consent of the parties, this Court provided a ruling on the record denying both Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Cross-Motion for Judgment on the Administrative

---

[14] Familiarity with this Court's decision in *Frawner* reflected in its March 31, 2022 decision on the record, March 31, 2022 Order, and its July 29, 2022 Memorandum and Order is presumed. *Frawner* Mar. 31 Tr.; *Frawner*, Order Granting in Part Plaintiff's MJAR and Denying in Part Defendant's Cross-MJAR (ECF No. 33) (*Frawner* Order); *Frawner* Mem. and Order.

Record as moot.  Transcript of Status Conference dated March 2, 2022 (ECF No. 25) at 8:4-9:22 (noting no objections on behalf of parties to Court's intention of first providing oral ruling followed by a later written opinion and judgment); *Ames* Mar. 31 Tr.

## APPLICABLE LEGAL STANDARD

This Court reviews post-award bid protests in two steps.  First, the Court analyzes the procurement under the Administrative Procedure Act (APA).  28 U.S.C. § 1491(b)(4); *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021).  Second, the Court must analyze whether the alleged errors prejudiced the protestor.  *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021).

Turning to the first step, the APA requires a reviewing court to determine "whether the agency's actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Off. Design Grp. v. United States*, 951 F.3d 1366, 1371 (Fed. Cir. 2020) (quoting *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013)); *see* 5 U.S.C. § 706.  Although the inquiry under the APA "is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416-20 (1971).  Accordingly, courts may set aside an award only if (1) "'the procurement official's decision lacked a rational basis[,]' or (2) 'the procurement procedure involved a violation of regulation or procedure.'"  *DynCorp*, 10 F.4th at 1308 (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)).

When a protestor alleges the agency's decision lacked a rational basis, the court reviews "whether the contracting agency provided a coherent and reasonable explanation of its exercise of

discretion." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quotations and citations omitted).  As the United States Court of Appeals for the Federal Circuit has explained, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quotations and citations omitted).  Indeed, agency decisions are "entitled to a presumption of regularity." *Impresa Contruzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001). Protestors bear a similar burden when alleging that the procurement involved legal or procedural violations, as the court reviews such claims for "a clear . . . violation of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

At the second step, regardless of whether the alleged error relates to irrational conduct or a violation of law, the protestor must establish that the agency's conduct prejudiced the protestor. *Sys. Studs. & Simulations, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021).  This is a factual question for which the protestor must show "that there was a 'substantial chance' it would have received the contract award but for" the alleged error.  *Bannum, Inc. v. United States,* 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citations omitted).  *De minimis* errors in the procurement process generally do not justify relief.  *Off. Design Grp.*, 951 F.3d at 1374.

If a protestor meets its burden of demonstrating that the procurement both violated the APA and prejudiced the protestor, declaratory or injunctive relief may be appropriate.  *See* 28 U.S.C. § 1491(b)(2).  However, successful protestors are not automatically entitled to an injunction.  *See Centech,* 554 F.3d at 1037.  Before entering injunctive relief, "the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court

withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Id.*

The Rules of the United States Court of Federal Claims provide the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum,* 404 F.3d at 1356. Parties initiate such proceedings by filing motions for judgment on the administrative record. *See* Rule 52.1(c). In adjudicating cross motions under Rule 52.1, this court resolves questions of fact by relying on the administrative record. *See id.* If necessary, this court may remand the case back to a governmental agency for further factual findings. *See* Rule 52.2.

## DISCUSSION

While it is not this Court's role to "substitute its judgment for that of the agency," it is within this Court's purview to determine whether an agency acted irrationally, violated U.S. procurement law, or acted in conflict with the terms of the Solicitation. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416-20 (1971); *see Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351-53 (Fed. Cir. 2004). Plaintiff argues that relief is appropriate because the Air Force (1) irrationally evaluated its Past Performance, and (2) arbitrarily evaluated Price. *See* Pl.'s MJAR at 19-33. Ames 1 seeks a permanent injunction barring the Air Force from proceeding with the Mini-MACC awards to Eklutna, Tyonek, and Orion. *Id.* at 33-37; Compl. at 17; *see also infra* n.22.

As noted, on March 31, 2022, this Court in *Frawner*, enjoined Defendant from proceeding with any awards under the same Solicitation at issue in this action, except for the award to SD Construction, or upon taking corrective action consistent with the Court's direction. *See Frawner* Order; *Frawner* Mem. and Order. This Court held that the Air Force's Mini-MACC awards and

on-ramp rankings, other than its award to SD Construction, involved an arbitrary and capricious Past Performance evaluation and best value tradeoff determination. *Id.*; *see also Frawner* Mar. 31 Tr. at 3:24-4:2; *Frawner* Mem. and Order at 29-44, 65-74. Further, this Court held in *Frawner* that should Defendant opt to continue with Mini-MACC awards under the Solicitation, other than to SD Construction, the Air Force must take corrective action consistent with the Court's direction. *See Ames* Mar. 31 Tr. at 11:25-14:25; *Frawner* Mar. 31 Tr. at 13:17-15:18; *Frawner* Mem. and Order at 72-74.

The Court's injunction in *Frawner* mooted the current protest as Ames 1 seeks the same relief as was already granted by this Court in *Frawner* — namely an injunction barring the Air Force from proceeding with its Mini-MACC awards. *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1378 (Fed. Cir. 2022) ("[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."). As the Court's ruling in *Frawner* moots Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 15) and Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 16), both motions are **DENIED as moot**.

Although the pending motions are moot, for completeness this Court addresses the parties' arguments on the merits. This Court then explains the basis for its injunction in *Frawner* of the same awards under the same Solicitation present in this action. As noted, Ames 1 argues that the Air Force's analysis and award decisions are arbitrary and capricious because the Air Force (1) irrationally evaluated its Past Performance, and (2) arbitrarily evaluated Price. *See* Pl.'s MJAR at 19-33. For the following reasons, this Court finds Plaintiff's Past Performance arguments lack merit, but finds one of Plaintiff's Price arguments compelling.

I. <u>Past Performance</u>

Plaintiff argues that the Air Force's Past Performance evaluation was irrational because the SSA (1) arbitrarily and capriciously rejected the SSEB's Past Performance recommendation, (2) failed to "properly document" its rationale for rejecting the SSEB's recommendation, and (3) improperly looked beyond offerors' overall Past Performance ranking "in contravention to the evaluation criteria that states a 'single' past performance rating would be assigned."  Pl.'s MJAR at 22-26 (quoting Tab 8 (Solicitation No. FA500021R0001 (May 3, 2021)) at AR 391).  This Court disagrees with Plaintiff's contentions.  Instead of raising a colorable claim, Plaintiff appears to predicate its argument on a preference for the SSEB's recommendation, which placed it as an awardee, over the SSA's decision, which instead placed it on the on-ramp.  *See* Tr. Oral Arg. at 11:14-17 (acknowledging on behalf of Plaintiff that Ames 1 preferred "the SSEB's recommendation because [it was ranked] third" versus the SSA's decision to rank Ames 1 seventh); *compare* Tab 41 (Source Selection Evaluation Board Report (December 8, 2021)) at AR 2651-52 (SSEB ranking Ames 1 third), *with* Tab 44 (Source Selection Decision (December 20, 2021)) at AR 2708-11 (SSA ranking Ames 1 seventh).  However, a party's preference for one rating over another is insufficient to render the SSA's analysis irrational.  *See Active Network, LLC v. United States*, 130 Fed. Cl. 421, 432 (2017), *aff'd*, 718 F. App'x 981 (Fed. Cir. 2018) (holding mere disagreements with an agency's past performance evaluation fail to establish that the agency acted unreasonably); *see also Newimar S.A. v. United States*, No. 21-CV-1897, 2022 WL 1592813, at *30 (Fed. Cl. May 12, 2022) (in price reasonableness context, "mere disagreement with the [agency's] conclusion . . . cannot sustain a protest").  Accordingly, as explained below, in exercising its limited APA review, this Court will not disturb the considered judgment of the SSA on this basis.

A.  <u>The SSA Rationally Analyzed the SSEB's Past Performance Recommendation</u>

Plaintiff first contends that the SSA arbitrarily and capriciously rejected the SSEB's recommendation on how to evaluate offerors with the same overall Past Performance rating.  Pl.'s MJAR at 23-24.  While the SSEB determined that the seven offerors receiving "Substantial Confidence" Past Performance ratings "were all essentially of equal value to the [G]overnment," and thus no comparison of their underlying Quality or Relevancy ratings were necessary, the SSA disagreed.  *Compare* Tab 41 at AR 2649 (SSEB), *with* Tab 44 at AR 2706 (SSA).  Instead, the SSA determined that "there are past performance records that demonstrate that some offeror[s'] performance history warrants an assessment of additional value amongst the other offers evaluated as '"[S]ubstantial [C]onfidence.'"  Tab 44 at AR 2706.  Plaintiff's disagreement with the SSA's findings fails to establish that the SSA improperly discounted the SSEB's Past Performance analysis.

This Solicitation is conducted under FAR "Part 15, Department of Defense (DoD) FAR Supplement Procedures, Guidance and Information Subpart 215.3, and Air Force FAR Supplement (AFFARS) Mandatory Procedure (MP) 5315.3."  Tab 8 at AR 317.  Under FAR 15.308, "[w]hile the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment."   Similarly, DFARS Procedures, Guidance, and Information (PGI) provides that "[t]he SSA is not bound by the evaluation findings of the SSEB . . . as long as the SSA has a rational basis for the differing opinion."  DFARS/PGI 215.3 ¶ 3.9.1; *see also* DFARS 215.300 ("Contracting officers shall follow the principles and procedures in Director, Defense Procurement and Acquisition Policy memorandum dated April 1, 2016, entitled 'Department of Defense Source Selection Procedures,' when conducting negotiated, competitive acquisitions utilizing FAR part 15 procedures.").  Thus, under governing regulations, the SSA not

only had the discretion to deviate from the SSEB's recommendation, but also had an obligation to issue a decision based on its "independent judgment."  FAR 15.308.

Plaintiff does not contest the SSEB's advisory role in the procurement process, nor does it argue that the SSA had to "rubber stamp" the SSEB's findings.  *See* Tr. Oral Arg. at 11:18-20 ("Source Selection Authorities, they must exercise their discretion.  They can't rubber stamp an SSEB.  And we don't take issue with that.").  Rather, Plaintiff contends that the SSA's methodology was irrational as it allegedly disregarded "the extensive narrative evaluation of each individual offeror's past performance documented throughout the [SSEB's] report" and merely examined "the highest number of Very Relevant efforts in correlation with the highest number of Exceptional PPQ[s] and CPARS assigned to each offeror."  Pl.'s MJAR at 25 (citation omitted). This contention cannot be squared with the Administrative Record.  In its decision, the SSA stated that it considered the entirety of the SSEB's report, which included the SSEB's narrative comments:

> I was given complete access to *all* available documents pertaining to the acquisition, including evaluation briefing slides, offeror proposals, consensus documentation, evaluation reports, price information, and other documentation to support my decision.  As the Source Selection Authority (SSA), after *extensive review* of the documentation and in *consultation with the Source Selection Evaluation Board (SSEB)*, and my advisors, I have determined that the proposals submitted by the following offerors offer[] the best overall value to satisfy the Air Force's stated requirements for the JBER Mini-MACC IDIQ.

Tab 44 at AR 2704 (emphases added).  Plaintiff fails to point to a portion of the SSA's decision indicating that it ignored or otherwise discounted the SSEB's "narrative comments."  *See* Pl.'s MJAR at 22-26.

The SSA's disagreement with the SSEB's conclusion that offerors with "Substantial Confidence" Past Performance ratings are of the same "value to the [G]overnment" is unrelated to whether the SSA properly considered the SSEB's narrative comments.  *Compare* Tab 41 at AR

2649 (SSEB analysis), *with* Tab 44 at AR 2706 (SSA analysis).   The Administrative Record reflects that the SSA fully considered the SSEB's report.  Tab 44 at AR 2704.  In its "independent judgment," the SSA considered the SSEB's approach to Past Performance and determined that a different mode of analysis was more appropriate.  FAR 15.308; *see* Tab 41.

The SSA's decision to depart from the SSEB's recommendation was squarely within the SSA's discretion and is certainly rational — differences in offerors' "quality control, timely performance, effectiveness of management, and regulatory compliance" that underly the Quality ratings could affect their "value to the Government."  Tab 8 at AR 390; FAR 15.308; DFARS PGI 215.3 ¶ 3.9.1.  For example, while two offerors may both have received "Substantial Confidence" Past Performance ratings, one may have received slightly higher underlying Quality ratings due to its comparatively better "timely performance" in the past.  It would be rational for the SSA to take slightly superior "timely performance" into account when considering the best value to the Government.  *See Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 909 (Fed. Cir. 2013) (finding rational agency's decision to consider sub-factor ratings and narrative comments, rather than just considering overall ratings).  That is exactly what the SSA did here by examining offerors with the same Past Performance rating and reviewing their underlying Quality ratings to differentiate between bids.  *See* Tab 44.  As the SSA acted rationally and within its discretion after "extensive" review of the SSEB report and other documents, Plaintiff fails to establish that the SSA arbitrarily and capriciously discounted the SSEB's findings.  Tab 44 at AR 2704.

### B.  The SSA Properly Documented Its Decision

Plaintiff next contends that the SSA failed to "properly document" its departure from the SSEB's analysis.  Pl.'s MJAR at 25-26 (citing FAR 15.308).  This claim also lacks merit.  FAR

15.308 requires the SSA to "document" its decision including "the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs." The SSA did so here in explaining that "[c]ontrary to the findings of the SSEB . . . there [were] past performance records that demonstrate[d] that some offeror[s'] performance history warrant[ed] an assessment of additional value amongst the other offers evaluated as '[S]ubstantial [C]onfidence.'" Tab 44 at AR 2706.  Plaintiff argues that "just one sentence" is insufficient to document the SSA's departure from the SSEB's analysis.  Pl.'s Reply at 15.  Yet, Plaintiff offers no binding jurisprudence to support its position, and this Court is unaware of any statutory or regulatory length requirement for proper documentation. *See id.*; Pl.'s MJAR at 25-26.  Substantively, the SSA's one-sentence rational is sufficient to explain its position. Accordingly, this Court finds that the SSA satisfied its documentation requirement with respect to Past Performance by noting that offerors receiving the same Past Performance rating did not necessarily provide the same "value to the [G]overnment."[15]  Tab 44 at AR 2706; *see also Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231, 244 (2020) (holding agency satisfied its documentation requirement by stating its conclusions "as to [bidder's] strengths, weaknesses and adjectival ratings").

> ### C. The SSA Appropriately Looked Beyond Overall Past Performance Adjectival Ratings

Finally, Plaintiff contends that by analyzing differences between offerors receiving the same "Substantial Confidence" Past Performance rating, the SSA impermissibly added an undisclosed sub-ranking criterion to its Past Performance evaluation.  Pl.'s MJAR at 25. Specifically, Plaintiff argues that by looking past the overall Past Performance rating — to Quality

---

[15] The sufficiency of the SSA's tradeoff analysis is discussed *infra* at Discussion Section III(B).

ratings, for example — in the final stage of its analysis when comparing Past Performance to Price, the SSA contravened the Solicitation's requirement that a "single" Past Performance rating be assigned. *Id.* (quoting Tab 8 at AR 391). This Court disagrees. Notwithstanding the contradictory nature of Plaintiff's Past Performance argument — on the one hand arguing that the SSA "did not look deep enough into the SSEB's report," while on the other hand asserting that the SSA "dug too deep" into the SSEB's underlying Quality ratings — Plaintiff's contention that the SSA was barred from looking beyond the overall Past Performance adjectival ratings fails as a matter of law. Def.'s Cross-MJAR at 30.

While the Solicitation indicates that "each offeror will be assigned a single [P]ast [P]erformance confidence rating," Plaintiff's argument ignores an agency's duty to look beyond adjectival ratings in making value judgments. Tab 8 at AR 391; *see Glenn Def. Marine*, 720 F.3d at 909 (finding rational agency's decision look beyond overall rating); *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 758 (2008) ("Looking beyond the adjectival ratings is necessary because proposals with the same adjectival rating are not necessarily of equal quality.") (internal quotations and citation omitted). An agency's review beyond the overall Past Performance adjectival ratings ensures that the agency can "determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).

Here, the Solicitation obligated the SSA to make such value judgments between offerors' "price and the Past Performance Confidence Rating[s]" if the SSA awarded the contract to a bidder other than one with the lowest price. Tab 8 at AR 389. As the SSA awarded three of the four contracts to bidders that did not have the lowest price, the Air Force was required to conduct a best

value tradeoff analysis.[16]  *Id.; see also* Tab 41 at AR 2566 (second place contract awardee Tyonek

price of $1,874,000.00) (third place contract awardee Eklutna price of $1,995,080.00) (fourth place

contract awardee Orion price of $1,441,274.11).  In conducting its tradeoff analysis, the SSA

permissibly examined Quality — a sub-factor of Past Performance assigned by the SSEB — to

assist the SSA in comparing offerors with identical Past Performance ratings.  Tab 8 at AR 389-

90; *see also* Tab 41; Tab 44.  Plaintiff presents no authority that bars the Air Force from looking

past the Past Performance adjectival rating and, as discussed, relevant authority dictates that the

agency *should* look past those ratings.  Accordingly, the Air Force acted rationally in looking

beneath the veil of the overall Past Performance to the Quality sub-rating before comparing those

ratings to Price.  Thus, had this Court ruled on the merits of this protest, Ames 1's Past Performance

argument would have failed.

II.   Price

        Plaintiff next argues that the Air Force's Price analysis was arbitrary, capricious, and

unlawful because the agency failed to conduct (1) "the required price reasonableness analysis" and

(2) "the required tradeoff analysis and award based on best value."  Pl.'s MJAR at 19-22, 26-31.

Defendant responds that the agency properly considered Price in both its price reasonableness and

best value tradeoff analyses.  Def.'s Cross-MJAR at 19-27, 31-40.  As Ames 1's Price arguments

mirror those raised by Frawner in its protest, this Court would have held — just as it held in

*Frawner* — that the Air Force's price reasonableness analysis was proper, while its best value

tradeoff analysis was arbitrary and capricious.  *Frawner* Mar. 31 Tr. at 3:24-4:2, 8:3-5; *Frawner*

Mem. and Order at 60.  Ames 1's price reasonableness argument is addressed below.  Since this

---

[16] In fact, the Air Force awarded two of the four contracts to the highest priced bidders — Tyonek
and Eklutna.  Tab 44 at AR 2708.

Court in *Frawner* held that the Air Force's best value tradeoff analysis was arbitrary and capricious, the Court does not separately address Ames 1's best value tradeoff argument. *Frawner* Mar. 31 Tr. at 8:24-12:2; *Frawner* Mem. and Order at 60. Rather, the Court will detail the flaws in the Air Force's best value tradeoff analysis by describing the basis of the injunction entered in *Frawner*. *See infra* Discussion Section III(B).

### A.    The Air Force Properly Evaluated Price Reasonableness

Plaintiff contends that the Air Force did not conduct the "required" price reasonableness evaluation under FAR 15.404-1(a)(1)[17] because "the SSA selected the two highest price offerors and the lowest price offeror for the award pool." Pl.'s MJAR at 19-22 (referencing Tyonek and Eklutna as highest priced offerors and SD Construction as lowest priced offeror); *see also* FAR 14.408-2(a) ("The contracting officer shall determine that . . . the prices offered are reasonable before awarding the contract. The price analysis techniques in 15.404-1(b) may be used as guidelines. In each case the determination shall be made in the light of all prevailing circumstances."). More broadly, Plaintiff argues that the Air Force's price reasonableness analysis ignored Price entirely, contravening the Solicitation, which required consideration of both Past Performance and Price. Pl.'s MJAR at 20-22. Specifically, Plaintiff alleges that the Air Force abandoned its "stated evaluation methodology" for determining whether all prices were reasonable. *Id.*; Tab 8 at AR 389. This Court disagrees. As explained below, the Air Force (1) compared offerors' prices by applying a method endorsed by the FAR, and (2) rationally concluded

---

[17] "The contracting officer is responsible for evaluating the reasonableness of the offered prices. The analytical techniques and procedures described in this subsection may be used, singly or in combination with others, to ensure that the final price is fair and reasonable. The complexity and circumstances of each acquisition should determine the level of detail of the analysis required."

based on its evaluation and expertise that the offerors' prices were reasonable.  Accordingly, the Air Force satisfied its obligation to analyze price reasonableness.

>    i.   The Air Force Properly Applied the Evaluative Technique It Selected to Analyze Price Reasonableness

At the outset, Plaintiff "does not take issue with the SSEB's use of techniques outlined in FAR 15.404-1(b)(2)(i) to assess fairness and reasonableness of proposed pricing," nor does it challenge the "SSEB's calculation and use of mean price to further analyze and establish price reasonableness and fairness."  Pl.'s Reply at 5.  Nor could it, as the FAR affords the agency the discretion to choose its test for conducting a price reasonableness analysis.  FAR 15.404-1(b)(2) ("The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price.").  One of the "preferred" methods is a "[c]omparison of proposed prices received in response to the [S]olicitation."  FAR 15.404-1(b)(2)(i); FAR 15.404-1(b)(3) (identifying preferred price reasonableness techniques).  Here, the Air Force satisfied its requirement under the FAR by calculating offerors' TEPs, averaging them, and then comparing the individual prices to the mean.  *See* Tab 41 at AR 2566; Tab 44 at AR 2706-07 (describing SSEB's price reasonableness analysis and adopting its finding of reasonable prices).  This analysis certainly meets the FAR endorsed test of comparing "prices received in response to the [S]olicitation."  FAR 15.404-1(b)(2)(i); *see also* Tab 41 at AR 2566.

>    ii.   The Air Force Rationally Determined That There Was Price Competition

Rather than critique the agency's price reasonableness evaluative technique employed, Plaintiff instead argues that the Air Force irrationally concluded that the offerors' prices were reasonable.  Pl.'s MJAR. at 20-21.  Specifically, Plaintiff contends that the Air Force's conclusion of price reasonableness cannot be squared with its finding that offerors' TEPs are "[un]reliable indicator[s] of their prices for future requirements."  *Id.* (quoting Tab 44 at AR 2707).  This Court

disagrees.  Ames 1's complaints "are nothing more than mere disagreement with the Agency's reasonable exercise of its considerable discretion."  *Vertex Aerospace, LLC v. United States*, No. 20-700C, 2020 WL 5887750, at *10 (Fed. Cl. Sept. 21, 2020).

While "[n]ormally, adequate price competition establishes a fair and reasonable price," agencies perform price reasonableness analyses to "prevent the Government from paying too high a price" for the procurement.  FAR 15.404-1(b)(2)(i); *see IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 406 (2021) (citation omitted).  The agency is best suited to assess whether the bidders' prices are reasonable.  *Serco Inc. v. United States*, 81 Fed. Cl. 463, 495 (2008) ("[T]he depth of an agency's price reasonableness analysis and its ultimate findings on that count are both matters of discretion.").  The Court need only assess whether the agency acted rationally in making its price reasonableness conclusion.  *Moore's Cafeteria Servs. v. United States*, 77 Fed. Cl. 180, 187 (2007), *aff'd,* 314 F. App'x 277 (Fed. Cir. 2008) (applying a rational basis standard to agency's price reasonableness analysis).  This Court finds that the Air Force's price reasonableness conclusion was rational.

First, the Air Force determined that the particularities of Anchorage construction pricing — which it notes have been exacerbated by COVID-19 sourcing issues — adequately explained the wide variation in proposal prices.  *See* Tab 41 at AR 2568; Tab 44 at AR 2707.  The agency based that finding on its years of experience and its observation that while some contractors have their own workforce, others do not, and while some own their own equipment, others will have to lease equipment — all issues especially relevant to the unpredictable Alaska construction market. *See* Tab 41 at AR 2568; Tab 44 at AR 2707.  An agency is permitted to use its knowledge and expertise during the procurement process, including in its evaluation of price reasonableness. *DynCorp Int'l LLC v. United States*, 139 Fed. Cl. 481, 487 (2018) (deferring to "an agency's

expertise in making procurement decisions"); *see also* Oral Arg. Tr. 35:21-25 (acknowledging on behalf of Plaintiff that there is a "certain amount of discretion that the Government gets in a FAR Part 15 negotiated procurement" in which the agency is "supposed to be using [its] expertise"). The Air Force is familiar with the Anchorage market based on previous contracts it has entered with third parties for services at JBER. *See, e.g.*, https://www.asrcfederal.com/asrc-federal-subsidiary-awarded-the-united-states-air-force-joint-base-elmendorf-richardson-base-operations-maintenance-services-contract/ (last viewed June 21, 2022). Thus, the agency acted reasonably in applying its knowledge of that market to the bids at issue in this procurement.

Second, unlike Plaintiff's contention that the Air Force completely disregarded Price due to its finding that TEPs were an "[un]reliable indicator of . . . prices for future requirements," this Court finds that the agency rationally cabined the relevancy of pricing for the seed project as it may apply to future unknown task orders. Tab 44 at AR 2707. While the Air Force recognized that "[t]he TEP is useful as a guide to give the Government an indication of how each offeror would price this specific project," it also acknowledged its limited applicability in an IDIQ procurement. *Id.* For example, the Solicitation noted that future task orders will vary from "facility upgrades, renovations, painting, utility work, airfield pavement, roads, roofs and other assorted repair and alteration projects" and tasks will vary in trade between "carpentry, asbestos abatement/removal, demolition, mechanical, electrical, plumbing, concrete masonry, welding, fire systems, and paving." Tab 8 at AR 395. These future task order projects will likely differ from the seed project as quantified by the TEP, and thus the Air Force rationally recognized that pricing for these future projects may cost more or less than the seed project. Tab 44 at AR 2707. Additionally, the Air Force recognized that competition for task orders among the four contract awardees would offset some uncertainty surrounding future cost reasonableness. Tab 44 at AR

2706 (noting that "the price being considered here, the TEP, is the proposed price for the seed project for this set of IDIQ contracts").  Such future price competition among the four IDIQ awardees further supports the Air Force's price reasonableness finding.  *See Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 142 (2020) (finding that contracting officer permissibly concluded that prices were reasonable even in the face of wide price variation where the agency justified such variations based on "the complex and unknown nature of the work" and future competition at the task order level would mitigate any price concerns) (citation omitted). Accordingly, the Air Force's explanation of price variation is rational based on (i) the agency's knowledge of the fluctuating Anchorage market, and (ii) the future competition for task orders among the four winning bidders.  *See Moore's Cafeteria Servs.*, 77 Fed. Cl. at 187; *Impresa*, 238 F.3d at 1332 (contracting officer "entitled to exercise discretion upon a broad range of issues confronting them in the procurement process") (internal quotation and citation omitted); *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 846 (1999) (contracting officer yields "wide discretion" in evaluation of bids).

> iii.  The Air Force Properly Considered Higher Priced Bids in its Price Reasonableness Determination

Plaintiff also claims that although it "is plainly evident from the fact that the SSA selected the two highest price offerors and the lowest price offeror for the award pool, the SSA did not consider, at all, the magnitude of the price differentials or the relative benefits yielded by higher priced offerors."  Pl.'s MJAR at 22.  To the extent Plaintiff contests the Air Force's best value tradeoff analysis, the Court discusses that argument *infra* at Discussion Section III(B).  On the other hand, to the extent Plaintiff is contending that the awards to SD Construction (the lowest priced offeror), Eklutna (the highest priced offeror), and Tyonek (the second highest priced offeror) indicate that the Air Force did not rationally consider price reasonableness, that claim is

belied by the Administrative Record.  *See* Tab 44 at AR 2708.  For Eklutna and Tyonek, whose TEPs exceeded the mean by 42.0% ($590,130.70 above the mean) and 33.9% ($469,050.70 above the mean) respectively, the Air Force assessed that "although th[ose] offeror[s'] price[s] [are] substantially higher than other offerors," they were still reasonable because of "extreme variability in prices seen in the past year."  Tab 41 at AR 2582 (Eklutna), AR 2602 (Tyonek).  This Court defers to the agency's judgment concerning "extreme [price] variability" over the prior year.  Tab 41 at AR 2582, AR 2602; *DynCorp Int'l*, 139 Fed. Cl. at 487.  For the lowest priced offeror, SD Construction, a price reasonableness analysis would not have assessed whether that price was too low as price reasonableness focuses on "prevent[ing] the Government from paying too high a price" for the procurement.  *IAP World Servs.*, 152 Fed. Cl. at 406 (citation omitted).  Instead, a price realism analysis focuses on whether prices are too low.  *Asset Prot. & Sec. Servs., L.P. v. United States*, 5 F.4th 1361, 1363 (Fed. Cir. 2021).  However, the Solicitation did not require the agency to conduct a price realism analysis, and the Air Force did not do so with this procurement. Tab 8 at AR 389 ("The Government reserves the right to conduct price realism."); Tab 44 at AR 2705 ("The Government did not perform a price realism analysis for this proposal.").  That reasonable decision was squarely within the Air Force's discretion.  Accordingly, had this Court ruled on the merits of this protest, Ames 1's price reasonableness argument would also have failed.

III.   <u>Basis for Injunction in *Frawner*</u>

The Court entered an injunction in *Frawner* based on Defendant's arbitrary and capricious Past Performance and best value tradeoff analyses.[18]  *Frawner* Mar. 31 Tr. at 3:24-4:12, 13:17-15:18; *Frawner* Mem. and Order at 72-74.  As this Court's Order in *Frawner* mooted Ames 1's

---

[18] Frawner presented a different Past Performance argument than Ames 1.  As Frawer and Ames 1 presented the same best value tradeoff argument, consideration of that argument is reflected in the Court's *Frawner* Memorandum and Order on pp. 65-70.

protest, the Court addresses the basis and scope of its injunction in *Frawner*.  *See supra* p. 30.

First, the Court describes the basis for finding the Air Force's Past Performance and best value

tradeoff analyses arbitrary and capricious.  Second, the Court describes the scope of its injunction.

A.   The Air Force's Past Performance Analysis Was Arbitrary and Capricious

This Court held that Defendant arbitrarily applied unstated evaluation criteria in two

instances during its Past Performance evaluation: (1) automatically applying the lowest of the three

Relevance sub-factor ratings as the overall Relevance rating and (2) imposing an unstated $2

million cap for evaluating past projects' "magnitude."  *Frawner* Mem. and Order at 32-44.

First, the Air Force's application of the lowest of the three sub-factor ratings as the overall

Relevance rating was arbitrary and capricious as (i) that procedure was not disclosed in the

Solicitation and (ii) it directly conflicted with the Solicitation's language.  *Id.* at 35-40.  Rather

than state that a project would be assigned adjectival ratings for a project's "scope," "magnitude,"

and "complexity," with the lowest rating of the three sub-factors serving as the overall Relevance

rating, the Solicitation simply stated that a past project's overall Relevance would be assessed

"based upon the extent to which past performance is of similar scope, magnitude and complexity

to the type of projects exemplified by the seed project for this [S]olicitation."  Tab 8 at AR 390.

As bidders were not put "on notice" of the significant consequences of submitting projects

containing some, but not all, of the three Relevance sub-factors — namely, that such projects

would be eliminated from further consideration — this Court held that the application of this

unstated evaluation criterion was arbitrary and capricious.  *Frawner* Mem. and Order at 36; *see,*

*e.g.*, Tab 41 at AR 2642-43.

This Court also held that this unstated criterion arbitrarily ran counter to the Solicitation's

language as the only projects that could be assigned an overall Relevance rating consistent with

the Relevance definitions were ones that received the same sub-rating for each sub-factor (*i.e.*,
assigned a "Relevant" "scope" and "complexity" and "magnitude" sub-rating). *Frawner* Mem.
and Order at 37-38. This reading makes it impossible to assign an overall Relevance rating to a
project that received different sub-factor ratings. *Id.* However, as the Solicitation required the
agency to assign all projects, including those with different sub-factor ratings, an overall Relevance
rating, the Court held this reading of the Solicitation unreasonable. *Id.* at 39. Rather, the Court
held that the only reasonable construction of the Relevance definitions is to consider all three sub-
factors together. *Id.* Under that reading, a project such as Frawner's Repair Network Operations
Center project could receive at least a "Somewhat Relevant" overall Relevancy rating given it has
"some of" the same relevancy sub-factors. *Id.*; *see* Tab 8 at AR 390; Tab 41 at AR 2642-43.

<u>Second</u>, the Air Force arbitrarily imposed an unstated criterion of a $2 million dollar cap
for past projects by assigning a project's "magnitude" sub-factor as "Not Relevant" if it exceeded
that cap and "Very Relevant" if it was below that cap. *Frawner* Mem. and Order at 40-44; *see,
e.g.*, Tab 41 at AR 2643-45 (listing two of Frawner's projects valued over $2 million as "Not
Relevant"). While the Air Force is entitled to significant deference in evaluating the relevancy of
past performance efforts based on their "magnitude," the Court held that the Air Force failed to
put bidders "on notice" of the serious consequences of failing to meet the unstated $2 million
requirement; namely that all projects valued at over $2 million would be rated as "Not Relevant"
and eliminated from further consideration. *Id.* While the $2 million maximum task order under
the Solicitation put bidders on notice that past projects valued at over $2 million might be rated
under the "magnitude" sub-factor as less relevant than those valued under $2 million, it did not put

bidders on notice that those projects would eliminated entirely from consideration.[19]  *Id.*; Tab 8 at AR 323.

      **B.**  The Air Force's Best Value Tradeoff Analysis Was Arbitrary and Capricious[20]

Next, the Court held that while thorough in several respects, the Air Force's best value tradeoff analysis was arbitrary and capricious given there were material gaps in the SSA's report. *Frawner* Mem. and Order at 65.  While the Court held that the agency was allowed to look beyond the overall Past Performance confidence ratings to examine the underlying Quality ratings, the Air Force was still required to document tradeoffs it made to warrant paying a higher price.  *Id.* at 66-67.  The only rankings for which the Air Force clearly documented best value tradeoffs were the highest and lowest ranked offers.  *Id.* at 69.  The Air Force reasonably explained that SD Construction, the first-ranked bidder, was a better value to the Government than Tyonek even though both were, in the SSA's eyes, "essentially equal" with regard to the highest Past Performance and Quality ratings because SD Construction had the lowest TEP of all offerors.  Tab 44 at AR 2707.  The SSA did not again "depart from the model of going strictly by [Q]uality ratings" until it came to ranking the two offerors with "Neutral Confidence" ratings.  *Id.* at AR 2710.  There, it reasoned that a 34% price premium was too much to pay for the better Past Performance rating of Tikigaq because there was essentially no past performance to compare.  *Id.* The decisions to rank Tyonek and Eklutna as the second and third best offers, Orion and Nodak as the fourth and fifth best offers, and the remaining offers, including those by Frawner and Ames 1,

---

[19] In *Frawner*, the Court conducted an analysis under relevant Federal Circuit authority and held that Frawner was prejudiced based on the Air Force's flawed Past Performance evaluation. *Frawner* Mar. 31 Tr. at 7:2-8:2; *Frawner* Mem. and Order at 56-59.

[20] Ames 1 made the same arguments as Frawner concerning the Air Force's best value tradeoff analysis.  Had this Court considered Ames 1's argument, it would have come to the same conclusion on best value as reflected in the *Frawner* Memorandum and Order.

in the on-ramp did not include documentation of tradeoffs where higher-priced offerors received a higher rank. *Id.*

The alleged benefits that justified ranking Tyonek and Eklutna after SD Construction even though their prices were 33.9% and 42.0% above the mean, respectively, were that "they ha[d] higher [Q]uality ratings than the offerors identified below as going into the on-ramp pool" and "the need for well-qualified contractors able to provide quality work for the period of this Mini-MACC [was] worth more to the Government than the risk represented by higher TEPs for the seed project, especially when that seed project [would] be awarded to a different offeror." *Id.* at AR 2707-08. However, the SSA did not explain what the Air Force gained materially other than being able to say that its projects were performed by a higher-rated company. *Id.* Although Past Performance is weighted significantly more than Price, when making a best value determination, it is well-established that price must still be meaningfully considered and reflected in the SSA's documented analysis. *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993) ("[T]he importance of price in a price/technical tradeoff must not be discounted to such a degree that it effectively renders the price factor meaningless."); *see also* Tab 8 at AR 389 (stating that "competing offerors' past performance proposal will be evaluated on a basis significantly more important than price").

As this Court explained, the Air Force must document its rationale by explaining why these additional Quality ratings outweighed paying a higher price. *Frawner* Mem. and Order at 68-69. A higher Quality rating could mean that the company's previous projects were more relevant in "scope." Or, it could mean that company's previous projects were more relevant in "magnitude" or "complexity." It could mean that the company had a better history of timely performance. Or, that the company had a better history of regulatory compliance. It is not clear that all these factors

are of equal value, and the SSA did not provide adequate documentation of its reasoning. Accordingly, the Court held that the Air Force should sufficiently document why these higher Quality rating values were worth paying higher prices, in some cases as much as 30-40% more.[21] *Frawner* Mem. and Order at 68-69.

      C.  Injunctive Relief and Corrective Action in *Frawner*

In *Frawner*, the Court enjoined the Air Force from awarding or proceeding with any award under the Solicitation other than to SD Construction, but permitted corrective action. *Frawner* Mar. 31 Tr. at 3:24-4:12, 13:17-15:18; *Frawner* Mem. and Order at 72-74. "[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy." *Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011). Indeed, the Tucker Act empowers this Court to "award *any* relief that [it] considers proper." 28 U.S.C. § 1491(b)(2) (emphasis added). SD Construction was the clear frontrunner, and the awardee of the seed project, as reflected by the SSA's report.[22] Tab 44 at AR 2707 (noting that SD Construction is the "most beneficial to the Government and is the first awardee listed" given it has "the lowest TEP of all offerors" at $933,000.00 and "has the highest [Q]uality rating of any offer"). The issues discussed regarding

---

[21] In *Frawner*, the Court found prejudice resulting from the Air Force's flawed best value tradeoff analysis. *Frawner* Mar. 31 Tr. at 11:19-12:2. The Court would have reached the same conclusion about the Air Force's best value analysis if it had first ruled in this action. As Ames 1 received a "Substantial Confidence" Past Performance rating and had a Price below three of the four eventual awardees, the Air Force's flawed best value analysis prejudiced Ames 1. Ames 1 would have had a "substantial chance" of receiving one of the Mini-MACC contracts placing it "within the zone of active consideration" for an award if the Air Force properly evaluated Price. *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011); Tab 41 at AR 2566.

[22] Counsel for Ames 1 acknowledged that SD Construction was the clear winner and that its protest, even if successful, would not challenge that outcome. Tr. Oral Arg. at 42:6-15 ("We are not taking issue with [the award to SD Construction] because they have the lowest price and they had the same rating. So it's only the other three [awardees] that had higher prices in the same rating that we took issue with.").

the Air Force's Past Performance and best value tradeoff evaluations will not change that outcome as it related to SD Construction due to its best performance ratings and lowest price.  *Id.* at AR 2707-09.  Keeping the award in place for SD Construction will also minimize potential disruptions to maintenance projects planned at JBER during the short Alaskan summer.

In *Frawner*, this Court also ordered that if Defendant opted to continue with awards under the Solicitation, it must undertake corrective action consistent with the following conditions:

> First, Defendant shall not treat the "magnitude" sub-factor as a binary factor where Past Performance efforts valued above $2 million receive a "Not Relevant" rating for that sub-factor and Past Performance efforts valued below $2 million receive a "Very Relevant" rating.  Rather, Defendant shall, to the extent it applies adjectival ratings to Relevance sub-factors, employ the full range of such ratings as defined in the Solicitation.  This is not to say that a project valued at over $2 million cannot be rated as "Not Relevant."  A past project valued at $7 million may potentially still receive a "Not Relevant" "magnitude" sub-rating given the significant variance between the maximum task order listed in the Solicitation and the past project's value.  However, if the Air Force chooses to rate that past project with a "Not Relevant" "magnitude" sub-rating, it must document the specific reason for doing so, the basis of which cannot be that it was applying an unstated $2 million threshold.

> Second, consistent with this Court's ruling, Defendant shall not automatically assign as the overall Relevance rating for a Past Performance effort the adjectival rating of the lowest rated Relevance sub-factor.  This means that the Air Force cannot use the lowest of the three Relevance sub-factor adjectival ratings as the automatic, overall Relevance score.  Rather, prior to assigning an overall Relevance adjectival rating, the agency should analyze each project's Relevance in its entirety, analyzing all three sub-factors together, consistent with the express terms of the Solicitation.  Again, this is not to say that a project with, for example, a "Not Relevant" "magnitude" sub-score and "Relevant" "scope" and "complexity" sub-scores cannot still receive an overall Relevance rating of "Not Relevant;" it may do so as long as that rating is consistent with the Solicitation's language.  However, the agency cannot do so merely because it is automatically adopting the lowest of the three sub-factor ratings.  The Air Force must document its reason for its rating consistent with the Solicitation's language.

> Third, regarding price and best value analysis, to the extent the Air Force concludes that a higher-priced offer presents the best value to the agency

> due to superior technical aspects reflected in the offeror's past performance rating, it must specifically document those benefits and whether they are worth the price premium.  Merely stating that an offeror has stronger Quality ratings will not suffice.  A fuller explanation is necessary that documents the tradeoffs the Air Force is making.

*Frawner* Mem. and Order at 73-74.

The Court's ruling in *Frawner* does not require the Air Force to adopt a specific ordering of the bids beyond SD Construction should Defendant opt to take corrective action and continue with awards under the Solicitation.  *Id*. at 74.  The Air Force has considerable discretion with how it moves forward with any reevaluation consistent with this Court's ruling.  *Id.*  However, it must do so in compliance with the terms of the Solicitation and the applicable provisions of the FAR, and consistent with this Court's Memorandum and Order in *Frawner*.  *Id*.

<u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 15) is **DENIED as moot** and Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 16) is **DENIED as moot**.  The Clerk of Court is **DIRECTED** to enter Judgment accordingly.

The parties are directed to **CONFER** and **FILE** a Notice within seven days of this Memorandum and Order, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

August 3, 2022
Washington, D.C.